**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
)
**TOWN OF PRINCETON,**                              )
)
       **Plaintiff,**                               )
)
       **v.**                                      )      **Civil Action No.: 15-cv-40096**
)
**MONSANTO COMPANY,**                               )
**SOLUTIA INC., and**                               )
**PHARMACIA CORPORATION,**                          )
)
       **Defendants.**                              )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                                                            **August 10, 2016**

## I.    Introduction

Plaintiff Town of Princeton ("Princeton") has filed this lawsuit against Defendants Monsanto Company, Solutia Inc. and Pharmacia Corporation ("Pharmacia") (collectively "Defendants") alleging breach of the implied warranty of merchantability (defective design), breach of the express warranty of merchantability (failure to warn), negligence and violation of the Massachusetts Consumer Protection Act based upon Defendants' conduct in manufacturing and distributing a chemical called polychlorinated biphenyls ("PCBs"). D. 1. Defendants now move to dismiss. D. 15. For the reasons stated below, the Court DENIES in part and ALLOWS in part the motion.

## II.    Standard of Review

On a Fed. R. Civ. P. 12(b)(6) motion to dismiss, the Court assesses whether the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). That assessment requires a two-step, context-

specific inquiry.  See García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013).  The Court begins by separating the factual allegations in the complaint from the conclusory legal allegations.  Id.  The factual allegations are accepted as true, while legal conclusions may be disregarded.  Id.  Moreover, the Court "draw[s] all reasonable inferences in favor of the plaintiffs." Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009) (citation omitted). Taken together, the factual allegations must give rise to the "reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).  The claim must be, in essence, "plausible on its face." García-Catalán, 734 F.3d at 103.  "In determining whether a [claim] crosses the plausibility threshold," the Court is instructed to "draw on its judicial experience and common sense."  Id. at 103 (internal quotation marks and citation omitted).

"Affirmative defenses, such as the statute of limitations, may be raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), provided that the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'"  Santana-Castro v. Toledo-Dávila, 579 F.3d 109, 113-14 (1st Cir. 2009) (alteration in original) (quoting Trans-Spec Truck Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 320 (1st Cir. 2008)) (internal quotation marks omitted). Dismissal based upon timeliness is appropriate where "the pleader's allegations leave no doubt that an asserted claim is time-barred."  LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 509 (1st Cir. 1998) (citations omitted).  If "the dates included in the complaint show that the limitations period has been exceeded and the complaint fails to 'sketch a factual predicate' that would warrant the application of either a different statute of limitations period or equitable estoppel, dismissal is appropriate."  Santana-Castro, 579 F.3d at 113-14 (quoting Trans-Spec Truck Serv., 524 F.3d at 320) (internal quotation marks omitted).

### III.     Factual Background

The following allegations are taken from Princeton's complaint and accepted as true for the purposes of this motion. Princeton is a town existing under the laws of the Commonwealth of Massachusetts. D. 1 ¶ 5. Princeton is the owner of the Thomas Prince School ("Prince School"), an elementary school for approximately 380 students. D. 1 ¶¶ 5, 38. Pharamacia is a Delaware limited liability company with its principle place of business in Peapack, New Jersey. Id. ¶ 6. Solutia Inc. is a Delaware corporation with its principal place of business in St. Louis, Missouri. Id. ¶ 7. Today Monsanto Company[1] is known as Pharmacia. Id. ¶ 3. Monsanto Company and Solutia, Inc. are affiliated companies that have assumed liabilities related to the historical manufacture of PCBs. Id.

Plaintiff alleges that from 1935 to 1978 Monsanto Company was the exclusive manufacturer of PCBs in the United States. Id. Princeton further alleges that PCBs are odorless and tasteless man-made chemicals that have been used in a wide range of industrial applications. Id. ¶¶ 12, 14. Between 1950 and 1978, products containing PCBs were widely used in the construction and renovation of buildings, including school buildings, throughout the United States. Id. ¶¶ 15-16. By the late 1960s, public researchers had begun questioning the safety of PCBs. Id. ¶ 29. Effective January 1, 1979, Congress banned most uses of PCBs and authorized the Environmental Protection Agency ("EPA") to apply restrictions to the usage of PCBs. Id. ¶ 31. In 1996, the EPA concluded that PCBs are "probable human carcinogens." Id. ¶ 19. On September 25, 2009, the EPA issued a press release "advising school administrators about the presence of

---

[1] The complaint appears to equate "Monsanto Company" with "Old Monsanto." D. 1 ¶¶ 6, 31, 49. While the Court takes the complaint to treat "Monsanto Company" and "Old Monsanto" as the same entity, throughout this opinion the Court maintains use of "Monsanto Company" as and where it appears in the complaint and maintains use of "Old Monsanto" as and where it appears in the complaint.

PCBs in school buildings built between 1950 and 1978." <u>Id.</u> ¶ 2.  Concurrent with the press release, for the first time the EPA published public health levels for PCBs in school indoor air.  <u>Id.</u>

PCBs have been demonstrated to affect the immune system, decreasing resistance to pneumonia and infections and increasing the risk of non-Hodgkin's lymphoma.  <u>Id.</u> ¶ 21.  PCBs are also associated with elevations in blood pressure, serum triglycerides and serum cholesterol. <u>Id.</u> ¶ 25.  The neurological effects of PCBs, to which children are particularly vulnerable, include significant deficits in visual recognition, short-term memory and learning.  <u>Id.</u> ¶ 23.  PCBs have several characteristics, including migration and degradation patterns, that render exposure to the chemicals increasingly risky as times passes.  <u>Id.</u> ¶ 17.  Princeton alleges that in 1977, Old Monsanto had discontinued the manufacture of PCBs, although the company's PCBs continued to be sold and distributed through the end of 1978.  <u>Id.</u> ¶ 31.  Princeton further alleges that as early as the 1930s Old Monsanto knew of the toxicity of PCBs, yet willfully failed to provide adequate warnings.  <u>Id.</u> ¶¶ 27-28.

The Prince School was originally constructed in 1962. <u>Id.</u> ¶ 39.  Princeton alleges that tests conducted at the Prince School in April 2011 detected PCBs at concentrations in excess of 50 parts per million in window caulking and glazing.  <u>Id.</u> ¶ 40.  Those detection levels exceeded the PCB levels authorized by the EPA.  <u>Id.</u>  In June 2011, additional samples taken at the Prince School confirmed the presence of PCBs in window caulking and demonstrated that PCBs were also present in joint caulking.  <u>Id.</u> ¶ 41.  In response to these high detection levels in the building materials, indoor air samples were collected from the six classrooms for which windows were scheduled to be replaced as part of the Prince School's window replacement project:  those indoor air samples were also found to contain concentrations of PCBs above advisory levels established by the EPA.  <u>Id.</u> ¶ 42.  Thus, a more comprehensive indoor air sampling program that evaluated

indoor air within the entire school building was undertaken on August 20, 2011.  Id. ¶ 43.  That comprehensive review found, *inter alia*, PCB levels above the EPA's guidance level in two additional classrooms.  Id.  On September 1, 2011, the PCB contamination prevented third, fourth and fifth graders from attending class at the Prince School.  Id. ¶ 44.  The students were bused to another school for approximately one year.  Id.  Princeton has since worked with the EPA and a contractor, Environmental Compliance Services, to clean up the PCBs and establish a monitoring and management plan.  Id. ¶¶ 45-48.  Based upon the fact that the Prince School was constructed when Old Monsanto produced at least 98% of the PCBs in the United States, Princeton alleges that the PCBs at the Prince School were manufactured by Defendants.  Id. ¶ 49.

On September 4, 2012, Lexington, another town in Massachusetts, filed a putative class action in this Court against the same defendants named here (the "Town of Lexington class action").  Id. ¶ 35.  Princeton was a member of the proposed class.  Id.  On behalf of the proposed class, Lexington alleged PCB contamination in its school and other Massachusetts schools.  Id. On March 24, 2015, this Court denied Lexington's motion to certify the putative class.  Id. ¶ 36.

**IV.    Procedural History**

Princeton instituted this action on July 1, 2015.  D. 1.  Defendants now move to dismiss. D. 15.  The Court heard the parties on the pending motion and took the matter under advisement.

**V.    Discussion**

**A.    Statute of Limitations Standard**

Tort claims typically accrue, and thus the statute of limitations starts to run, at the time the plaintiff is injured.  See Taygeta Corp. v. Varian Assocs., Inc., 436 Mass. 217, 229 (2002) (citations omitted); Bowen v. Eli Lilly & Co. Inc., 408 Mass. 204, 205 (1990).  In cases involving inherently unknowable dangers, however, the discovery rule provides that causes of action do not accrue until

the plaintiff learns, or reasonably should have learned, that she has been harmed by the defendant's conduct.  See Taygeta, 436 Mass. at 229 (citations omitted).  The claim, thus, accrues when the plaintiff "has knowledge of both her injury and its likely cause or has sufficient facts available such that she reasonably should discover the probable causal relationship between her injury and conduct of the defendant."  Errichiello v. Eli Lilly & Co., 618 F. Supp. 484, 486 (D. Mass. 1985); see White v. Peabody Constr. Co., Inc., 386 Mass. 121, 130 (1982) (stating that "the statute of limitations begins to run when the injured person has notice of the claim").

Once the plaintiff has received sufficient notice of potential injury arising from an inherently unknowable danger, the plaintiff has a duty to inquire into her possible injury.  See, e.g., Bowen, 408 Mass. at 210; Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 48 (1st Cir. 2004) (explaining that limitations period is triggered by "sufficient information").  The plaintiff may not "rest on [her] rights" and "ignore[] [the] duty to further investigate."  Pitts v. Aerolite SPE Corp., 673 F. Supp. 1123, 1128 (D. Mass. 1987) aff'd sub nom. Cornell v. E.I. Dupont de Nemours & Co., Inc., 841 F.2d 23 (1st Cir. 1988).  Application of this standard often gives rise to factual inquiry and those factual disputes regarding the date upon which the plaintiff knew or should have known of her claim belong to the trier of fact.  See Wolinetz, 361 F.3d at 48.

**B.      Defendants Are Not, at this Juncture, Entitled to Dismissal of Princeton's Warranty and Negligence Claims on Timeliness Grounds**

**1.      Defendants Have Not Demonstrated that, as a Matter of Law, the EPA Press Release Provided Princeton Sufficient Notice of Likely Harm**

Defendants contend that Princeton's warranty and negligence claims are time-barred.  The parties agree that Massachusetts' three-year statute of limitations for negligence and breach of warranty claims applies to Princeton's claims.  D. 16 at 5; D. 25 at 4.  As the parties note, pursuant to Mass. Gen. L. c. 260, § 2A, tort actions must be commenced within three years of the accrual

6

of the cause of action. The parties, however, dispute whether Princeton's negligence and warranty claims fall within the three-year limitations period.[2]   In Defendants' view, Princeton's claims accrued on September 25, 2009 because on that date, the EPA issued its press release regarding PCBs. D. 16 at 6-8. Princeton denies that the EPA press release was sufficient to trigger inquiry notice. D. 25 at 5-7. According to Princeton, the accrual of its claims coincided with its injury and both occurred in April 2011 when Princeton first received test results confirming that PCBs were present in the Prince School. Id. at 4.

The parties do not dispute that PCB contamination is the type of inherently unknowable danger to which the discovery rule applies. D. 16 at 5; D. 25 at 4, 6. Thus, Defendants are entitled to dismissal only if they have demonstrated, as a matter of law, that the EPA press release provided Princeton sufficient notice of the likely harm that Princeton faced such that the three-year statute of limitations began running on the date the press release was issued.   Under that scenario, Defendants insist, the statute of limitations for the negligence and breach of warranty claims expired before the filing of Princeton's complaint on July 1, 2105. D. 16 at 7-8.

In assessing the sufficiency of the notice, courts must focus on the particular facts of the case.  See In re Pharm. Indus. Average Wholesale Price Litig., 491 F. Supp. 2d 20, 76 (D. Mass. 2007), aff'd, 582 F.3d 156 (1st Cir. 2009); Bowen, 408 Mass. at 207-08. Although the plaintiff is not entitled to "notice of every fact which must eventually be prove[n] in support of the claim," White, 386 Mass. at 130, the plaintiff must have "knowledge or sufficient notice that she was harmed and . . . knowledge or sufficient notice of what the cause of harm was," Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 228 (2009) (citation and internal quotation marks omitted).

---

[2] Defendants have not challenged the timeliness of Princeton's Mass. Gen. L. c. 93A claim. D. 16 at 5; D. 25 at 4 n.1.

"The plaintiff receives notice, and the statutory period begins to run, when the plaintiff knows or reasonably should have known that it sustained appreciable harm as a result of the defendant's negligence." Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc., 29 Mass. App. Ct. 215, 218 (1990) (citations omitted). Thus, the inquiry is whether, in the context of the specific factual allegations of this case, the press release contained sufficient facts to provoke a reasonable plaintiff to investigate further because "[t]he appropriate test for determining whether plaintiffs should have known about facts giving rise to their claims is an objective one." In re Pharm., 491 F. Supp. 2d at 76 (citing McIntyre v. United States, 367 F.3d 38, 52 (1st Cir. 2004)).

On September 25, 2009, the EPA issued a press release entitled "EPA Announces Guidance to Communities on PCBs in Caulk of Buildings Constructed or Renovated between 1950 and 1978 EPA to gather latest science on PCBs in caulk."[3] D. 16-1 at 2. In the press release, the EPA "announced a series of steps that building owners and school administrators should take to reduce exposure to PCBs that may be found in caulk in many buildings constructed or renovated between 1950 and 1978." Id. The press release described PCBs as "man-made chemicals that persist in the environment and were widely used in construction materials and electrical products prior to 1978." Id. As the press release outlined, "PCBs can affect the immune system, reproductive system, nervous system and endocrine system and are potentially cancer-causing if they build up in the body over long periods of time." Id. The press release noted that "[t]here are several unresolved scientific issues that must be better understood to assess the magnitude of the problem

---

[3] The Court is permitted to consider the EPA press release because it is central to the complaint and is not challenged by either party. See Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (noting that "[w]hen the complaint relies upon a document, whose authenticity is not challenged, such a document 'merges into the pleadings' and the court may properly consider it under a Rule 12(b)(6) motion to dismiss" (citations omitted)).

and identify the best long-term solutions." Id. at 3.  The press release stated that "[a]lthough this is a serious issue, the potential presence of PCBs in buildings should not be a cause for alarm." Id. at 2.

The Court cannot conclude at this juncture that this press release is on its own sufficient notice as a matter of law.  As a general matter, "application of Massachusetts' discovery rule requires a careful analysis of the factual record." Fidler v. Eastman Kodak Co., 714 F.2d 192, 193 (1st Cir. 1983).  The question of notice typically involves "an individualized fact-intensive inquiry," In re Fresenius Granuflo/NaturaLyte Dialysate Prods. Liab. Litig., 76 F. Supp. 3d 294, 309 (D. Mass. 2015) (citation omitted), and the factually-intensive nature of the inquiry is only heightened here due to the complexity of PCBs, including their allegedly odorless and tasteless nature, D. 1 ¶ 14, and the decades over which the allegations of this complaint span, id. ¶ 2.  Courts have recognized that notice can be a particularly complicated inquiry in cases involving toxic torts. See, e.g., Taygeta Corp., 436 Mass. at 227-28 (describing subsurface groundwater contamination as "inherently unknowable in the absence of environmental testing" while also recognizing that "[s]ome forms of environmental contamination may be obvious, such as through sight, smell, or taste, and sometimes there is no uncertainty as to its source"); Donovan, 455 Mass. at 228 (explaining that "[i]n the context of toxic torts, where the harm may not have been manifested by the onset of disease, notice of harm and cause in many cases may not occur until the plaintiff is so advised by a physician"); Doherty v. Admiral's Flagship Condo. Tr., 80 Mass. App. Ct. 104, 109 (2011) (noting that "without some indication of a hazardous contamination, the plaintiff could not have been aware that she was being exposed to toxic mold" even though defendants pressed that a water leakage in the plaintiff's condominium unit constituted notice).

Without the benefit of discovery, the Court's context within which to assess the degree of notice provided by the press release is significantly limited.  See, e.g., Axler v. Sci. Ecology Grp., Inc., No. 98-cv-10161-MLW, 1999 WL 1209512, at *4 (D. Mass. May 21, 1999) (denying motion to dismiss where "[i]t cannot on the present record . . .  be properly determined when plaintiffs should have discovered the facts constituting the alleged violation"); Swack v. Credit Suisse First Bos., 383 F. Supp. 2d 223, 235-36 (D. Mass. 2004) (declining to rule on date of inquiry notice on motion to dismiss because resolution of date of inquiry notice was a factual question even though defendant pointed to "numerous news articles and speeches" as having placed plaintiff on notice of potential securities fraud).  Here, "[a]t the motion to dismiss stage," a record that "contain[s] some facts that hint[] at the possibility of inquiry notice as early as" Defendants posit is insufficient to warrant dismissal; for dismissal to be appropriate, there must be a showing of such strength that "justifie[s] a compelled finding . . . on inquiry notice at th[is] juncture."  Warren Freedenfeld Associates, Inc. v. McTigue, 531 F.3d 38, 46-47 (1st Cir. 2008).  Defendants' demonstration that the EPA's press release provided sufficient notice of likely injury must compel the finding that the press release alerted Princeton and thereby triggered the running of the statute of limitations. Defendants have failed to make that substantial showing.

First, Defendants have failed to demonstrate that a single press release broadly addressed to "building owners and school administrators," is sufficient on its own to provide, as a matter of law, adequate notice of a complex contamination issue of the sort presented here.  Instead, sufficient notice has more typically been found where there was repeated coverage of the possibility of injury.  See, e.g., Church v. Gen. Elec. Co., No. 95-cv-30139-MAP, 1997 WL 129381, at *1 (D. Mass. Mar. 20, 1997); Bowen, 408 Mass. at  210 ; McIntyre, 367 F.3d at 60; In re Pharm., 491 F. Supp. 2d at 78.  It is specifically "[w]here events receive . . .  widespread publicity

[that] plaintiffs may be charged with knowledge of their occurrence." In re Pharm., 491 F. Supp. 2d at 78 (citing McIntyre, 367 F.3d at 60 and United Klans of Am. v. McGovern, 621 F.2d 152, 154 (5th Cir.1980)) (internal quotation marks omitted).  Indeed, a close review of the cases upon which Defendants rely demonstrates that sufficient notice, where it is even resolved pre-trial, is typically found at the summary judgment stage and based upon relatively widespread information dissemination that consisted of more than a single press release.  For example, in Church v. Gen. Elec. Co., an action regarding PCB contamination, the court ruled on a summary judgment motion that "massive evidence" of pollution of the river at issue, "scores of articles" published and the "blizzard of information and discussion about PCB contamination of the [river at issue] for decades prior to the filing" placed the plaintiffs on notice such that the plaintiffs' claims accrued.  Church, 1997 WL 129381, at *1-2, *5.  Based upon the present record before it, the Court cannot determine that a single press release rises to a level comparable to "massive evidence" or "scores of articles."  See id.

Defendants also rely upon Bowen v. Eli Lilly & Co., 408 Mass. 204 (1990).  In Bowen, however, the Supreme Judicial Court concluded at the summary judgment juncture that "numerous articles published in the popular media" documenting the casual link between a prescription drug and the plaintiff's injury coupled with an individualized medical opinion the plaintiff received regarding the same placed her on notice of her claim.  Bowen, 408 Mass. at 210-11.  Similarly, in McIntyre v. United States, certain of the plaintiffs were found to be on inquiry notice of their claims where "[l]ocal news coverage [regarding their potential injury] was extensive."  McIntyre, 367 F.3d at 60.  Significantly, even while concluding that the notice that the defendant pointed to was sufficient to trigger accrual, the court in McIntyre recognized that "whether a reasonable person in [the plaintiff's] position would have read news coverage is a fact-intensive

inquiry and can sometimes be difficult to resolve on a motion to dismiss." Id. (footnote omitted). The Court here is not persuaded at this juncture that the single press release upon which Defendants rely constitutes extensive coverage, particularly in light of the fact-intensive nature of this notice inquiry.  Similarly, the court in In re Pharm. Indus. Average Wholesale Price Litig. found after a bench trial that the plaintiffs had received sufficient notice, but the decision turned upon the fact that there were "a few articles and government reports" alerting the plaintiffs.  In re Pharm., 491 F. Supp. 2d at 78.[4]

Second, even if a single press release were sufficient to place Princeton on notice of a complex contamination issue in its own school, the Court cannot conclude without further factual development that the content of the press release issued by the EPA was sufficiently specific to alert Princeton to "both [its] injury and [the] likely cause." Errichiello, 618 F. Supp. at 486.  In addition to considering the pervasiveness of the coverage of the potential injury, courts also consider the "content of the publicity and the particular circumstances of the relevant plaintiff(s)." In re Mass. Diet Drug Litig., 338 F.Supp.2d 198, 208 (D. Mass. 2004).  The EPA's press release was addressed to the broad audience of "school administrators" and "building owners."  D. 16-1 at 2.  Rather than providing any specifics as to the buildings that were likely at risk, the press release described as potentially affected any building constructed during a span of twenty eight years.  Id.  Moreover, the press release encouraged school administrators to take steps to "reduce

---

[4] Defendants' reliance on Pitts v. Aerolite SPE Corp., 673 F. Supp. 1123, 1128 (D. Mass. 1987) (concluding that notice requirement was satisfied where plaintiff sought medical advice regarding the impact of the condition and there was a "nasty" odor in the allegedly contaminated house), aff'd sub nom. Cornell v. E.I. Dupont de Nemours & Co., 841 F.2d 23, 25 (1st Cir. 1988) (stating that "[g]iven the nature and extent of [the plaintiff's] symptoms, appellants undoubtedly had sufficient notice to trigger their duty to inquire") does not warrant a different result.  Pitts is distinguishable at a minimum because there is no analogous assertion here that Princeton received the equivalent of an individualized diagnosis or ignored apparent symptoms, D. 16 at 5-8.

exposure" to PCBs; granting every reasonable inference in favor of Princeton, as the Court must do on this motion, it is plausible that this assertion failed to put recipients on notice as to the specific danger posed by PCBs and the corrective steps that were necessary.  Id.  This is particularly true given that the press release stated that "although this is a serious issue, the potential presence of PCBs in buildings should not be a cause for alarm."  Id.  In sum, the language of the EPA press release provides further support for the Court's conclusion that it cannot, at this juncture, rule that the EPA press release constituted sufficient notice as a matter of law.  See, e.g., McIntyre, 367 F.3d at 56 (concluding that "without more specific information than provided" the news article defendant pointed to did not provide adequate notice to one of the plaintiffs of his potential claims).

In the end and on this record, the Court cannot rule out the possibility that, as Princeton insists, the EPA press release was insufficient to alert Princeton to the likelihood of harm.  See, e.g., Am. Glue & Resin, Inc. v. Air Prods. & Chems., Inc., 835 F. Supp. 36, 43 (D. Mass. 1993) (denying motion to dismiss on timeliness grounds where complaint was timely when "viewed in [the plaintiff]'s favor," including granting reasonable inferences in plaintiff's favor); Mirabello v. Atrium Med. Corp., No. 12-cv-30082-KPN, 2013 WL 1113502, at *4-5 (D. Mass. Mar. 15, 2013) (denying motion to dismiss on timeliness grounds where "the court [was] not convinced for present purposes that [p]laintiff was on inquiry notice" on the date defendant alleged).  Without the benefit of discovery and briefing on the nature of PCBs, the ways in which the presence of PCBs may be detected, the manner in which and the degree to which the EPA press release was disseminated and the extent to which PCBs received any other public coverage, it is particularly premature for this Court to conclude that the EPA press release constituted, as a matter of law and on its own, sufficient notice to trigger accrual of Princeton's claims.

Whether the EPA press release offered Princeton adequate notice is a factual question that belongs to the trier of fact either on a motion for summary judgment or at trial. See Genereux v. Am. Beryllia Corp., 577 F.3d 350, 360 (1st Cir. 2009); In re Fresenius Granuflo, 76 F. Supp. 3d at 309.   Accordingly, Defendants are not entitled to dismissal of Princeton's warranty and negligence claims based upon timeliness at this early stage in the proceedings.

### 2.      The Nature of PCBs Precludes the Court from Determining the Date of Princeton's Injury without Further Factual Development

In refuting Defendants' argument that Princeton's claims began accruing when the EPA issued the press release, Princeton urges the Court to conclude that Princeton's injury did not occur until test results confirmed the presence of PCBs in Princeton's buildings in 2011. D. 25 at 4-5.  Princeton stresses that its claims could not have accrued in 2009 because Princeton was not injured until 2011.  Id.  For their part, Defendants assert that Princeton suffered its alleged injury when the PCB-containing products were incorporated into the school building during construction.  D. 16 at 5; D. 34 at 4.

The Court is unable to resolve the date of Princeton's injury without a meaningfully developed factual record.[5]  The date of injury is a separate and distinct legal inquiry from the date of accrual.  See Lindsay v. Romano, 427 Mass. 771, 774 (1998).  As a legal matter, the relationship between the two events is well-established:  Accrual cannot predate injury, because "a . . . claim cannot be maintained and, therefore, does not accrue, without a showing of some harm."

---

[5]  To the extent that Princeton intended to suggest that this Court already decided the date of injury in Town of Lexington v. Pharmacia Corp., 133 F. Supp. 3d 258 (D. Mass. 2015), see D. 25 at 5, the Court rejects that suggestion.  In reaching its conclusion in Town of Lexington, this Court specifically noted that it was not deciding the date of the injury caused by the presence of PCBs. Town of Lexington, 133 F. Supp. 3d at 265 (stating that "[w]ithout deciding the exact date of injury, the Court concludes that, prior to 1973, Lexington was not reasonably aware of the possibility that it was injured").

Int'l Mobiles Corp., 29 Mass. App. Ct. at 217-18.  While "[i]t is not required that the extent of injury be known before accrual of a cause of action," at least some degree of harm must come to the plaintiff as a result of defendant's conduct.  Hanson Hous. Auth. v. Dryvit Sys., Inc., 29 Mass. App. Ct. 440, 446 (1990) (citing Town of Mansfield v. GAF Corp., 5 Mass. App. Ct. 551, 555 (1977).  Thereafter, the claim accrues when the plaintiff has notice sufficient to realize the likelihood of injury.  See Lindsay v. Romano, 427 Mass. 771, 774 (1998); see also White v. Peabody Const. Co., 386 Mass. 121, 130 (1982).

In some negligence and warranty cases, resolving the date of injury is often relatively straight-forward.  See, e.g., Int'l Mobiles Corp., 29 Mass. App. Ct. at 218 (explaining that "[i]n the general run of cases, negligence actions accrue when the accident happens and a person is injured . . . [t]he ladder collapses and the woman on it suffers a broken leg . . . [s]uspected negligence and harm are apparent, and the statute of limitations begins to run" before distinguishing the more complicated questions regarding injury that are raised by cases involving "inherently unknowable" harm).  In suits alleging contamination of property, however, the date of the injury may be complicated by the particular nature of the allegedly toxic chemicals.  See, e.g., Hall v. Zen-Noh Grain Corp., 787 So. 2d 280, 282 n.3 (La. 2001) (acknowledging that the exact date of injury in toxic tort case was unclear despite plaintiff alleging a date of injury and instructing for exploration of the date of injury through discovery); In re Propecia (Finasteride) Prod. Liab. Litig., No. 12-cv-2049-VVP, 2013 WL 3729570, at *7 (E.D.N.Y. May 17, 2013) (stating that "toxic tort cases involve not only different injuries, but 'more complicated issues of causation and exposure'").

Because of the complex nature of PCBs, the date of injury is a multi-layered question here.  As alleged, PCBs are man-made chemicals comprised of chlorine atoms attached to a double

carbon-hydrogen ring.  D. 1 ¶ 12.  As a result of being stable compounds, PCBs persist in the environment for long periods of time.  Id. ¶ 17.  PCBs do not readily degrade.  Id.  Over time, PCBs volatize and cycle between air, water and soil, even when not physically disturbed.  Id.  Princeton further alleges that PCBs easily migrate from building materials such as caulk into surrounding areas, although Princeton does not allege the speed at which PCBs migrate.  Id.  Princeton alleges that, over time, PCBs degrade into lesser chlorinated types of PCBs that are more potent from a neurotoxic standpoint.  Id.  Princeton does not allege the speed at which this degradation occurs.  According to Princeton, the risks posed by the presence of PCBs in a building increase over time.  Id.  Princeton alleges that the PCB contamination in the Prince School caused property damage that required investigation, clean-up, abatement, remediation and monitoring costs.  Id. ¶¶ 53, 56, 60, 63.

The allegations in this case, which the Court must accept as true for the purposes of this motion, raise a number of questions regarding the nature of PCBs, the manner in which and the speed at which PCBs contaminate a building the size of the Prince School and the manner in which PCBs cause the kind of property damage that is alleged.  Indeed, in the Town of Lexington class action, this Court anticipated that "the determination of the date of the injury appears to be a complex question that turns on the facts of the case, such as the nature of PCBs and how they damage and contaminate property."  Town of Lexington, 133 F. Supp. 3d at 263 (citation and internal quotation marks omitted).  For all of these reasons, at this juncture the Court cannot and does not rule upon the date of Princeton's injury.

### C.    Princeton's Claims, including the Negligence Claim, Were Tolled by the Town of Lexington Class Action

The parties agree that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit

been permitted to continue as a class action." Am. Pipe & Constr. Co. v. Utah, 414 U.S. 538, 554 (1974) (footnote omitted).  The claims of individual class members remain tolled up until class certification is denied.  See Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 354 (1983). Defendants appear to concede that Princeton's breach of warranty and Mass. Gen. L. c. 93A claims, which are the same as those raised by proposed class in Town of Lexington were tolled by the Town of Lexington class action.[6]  D. 16 at 8.  Defendants, however, contend that class action tolling does not apply to Princeton's negligence claim, because the Town of Lexington class action did not contain a negligence claim.  Id. at 8-9.  In Defendants' view, class action tolling applies only to claims that are identical to the claims raised in the original class action.  Id.

Class action tolling was designed to prevent a flurry of "needless" filings by class members during the pendency of a class action.  See Am. Pipe & Constr. Co., 414 U.S. at 554.  Although it provides for the tolling of certain claims, the doctrine operates in a manner that is "in no way inconsistent with the functional operation of a statute of limitations."  Id.  Class action tolling is consistent with the statute of limitations' aim of "preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared"  because the class action that triggers tolling provides defendants adequate notice of the allegations against them.  Id.  Defendants are thereby alerted to the need to preserve the relevant evidence, memories and witnesses.  See id.  Where the defendants are provided, "[w]ithin the period set by the statute of limitations," the "essential information necessary to determine both the subject matter and size of the prospective litigation," the

---

[6] To the extent that Defendants argue that "even after class action tolling, the breach of warranty claims fell outside the statute of limitations," D. 16 at 8, the Court rejects this argument, since Defendants rely upon September 25, 2009, the date of the EPA press release, for the purposes of calculating same, D. 16 at 10, which the Court cannot accept on this record for the reasons discussed above regarding the application of the discovery rule.

defendants are not prejudiced by class action tolling.  Crown, Cork & Seal Co., 462 U.S. at 354-55 (citation omitted).  For that reason, "when a plaintiff invokes [class action tolling] in support of a separate lawsuit, the district court should take care to ensure that the suit raises claims that 'concern the same evidence, memories, and witnesses as the subject matter of the original class suit.'"  Id. at 355 (citing Am. Pipe & Constr. Co., 414 U.S at 562).

Consequently, "to be eligible for [class action] tolling, the claims of a subsequent plaintiff must be sufficiently similar to the claims brought by the failed class such that the class action effectively put the defendant on notice of the plaintiff's potential claims."  See, e.g., Arivella v. Lucent Techs., Inc., 623 F. Supp. 2d 164, 180 (D. Mass. 2009) (citations omitted).  "[L]imiting [class action] tolling to the identical 'causes of action' asserted in the initial class action would encourage and require absent class members to file protective motions to intervene and assert their new legal theories prior to class certification, thereby producing the very results" that tolling was designed to prevent.  Cullen v. Margiotta, 811 F.2d 698, 721 (2d Cir. 1987) (citations omitted).  Therefore, there is no requirement that claims must be identical to benefit from class action tolling.  See, e.g., Tosti v. City of Los Angeles, 754 F.2d 1485, 1489 (9th Cir. 1985) (concluding that there was "no persuasive authority for a rule which would require that the individual suit must be identical in every respect to the class suit for the statute [of limitations] to be tolled");  In re Linerboard Antitrust Litig., 223 F.R.D. 335, 351 (E.D. Pa. 2004) (explaining that "[f]or tolling to apply, claims do not have to be identical but only substantially similar to those brought in the original class action");  In re Indep. Serv. Organizations. Antitrust Litig., No. 97-cv-1021-EEO, 1997 WL 161940, at *3 (D. Kan. Mar. 12, 1997) (stating that "[i]f the class suit was sufficiently similar to give defendant ample notice of plaintiff's individual claims, then tolling generally will be appropriate").

Princeton's negligence claim is sufficiently similar to the claims that were asserted in the Town of Lexington class action for tolling to apply.  The putative class in Town of Lexington alleged that Defendants marketed, sold and promoted PCB-containing products without adequately warning users of the toxic nature of PCBs.  See Town of Lexington v. Pharmacia Corp., 12-cv-11645, D. 1 ¶¶ 26, 27.  The class asserted a breach of warranty claim, alleging more specifically that Defendants knew or should have known of the contaminating potential of PCBs and Defendants failed to warn the plaintiffs of that hazard.  Id. ¶¶ 53-55.  The class alleged in its Mass. Gen. L. c. 93A claim that Defendants' misrepresentations and omissions regarding PCBs constituted unfair and deceptive acts.  Id. ¶¶ 57-59.  These are, in substance, the same allegations that underlie Princeton's negligence claim in this action.  In its negligence claim in this action, Princeton alleges that Defendants negligently manufactured, marketed and distributed PCBs and failed to provide adequate warnings regarding the nature of PCBs.  D. 1 ¶¶ 58-59.  In addition, Princeton alleges the same harm that the putative class alleged:  "property damage, requiring investigation, clean-up, abatement, remediation, and monitoring costs."  Compare id. ¶ 60 with Town of Lexington, 12-cv-11645, D. 1 ¶ 55.

In this way, Princeton's negligence claim shares the same factual allegations as the claims that were asserted in the Town of Lexington class action.  Princeton's newly asserted negligence claim will involve the same evidence that Defendants were already on notice to preserve.  Indeed, Defendants have not identified any particular evidence needed to defend against the negligence claim that was not needed to defend against the related claims raised in the Town of Lexington class action.  D. 16 at 8-9.  As such, the class action provided Defendants notice of "the potential claims it might have to defend, the factual bases for those claims, and the potential witnesses who might be called."  See, e.g., Arivella, 623 F. Supp. 2d at 180 (concluding that class action tolling

applied to newly asserted claim that was sufficiently similar).  Accordingly, the class action tolled Princeton's negligence claim.

The cases upon which Defendants rely do not undermine this conclusion because in those cases the courts determined that class action tolling did not apply to claims that required a meaningfully different set of factual allegations, a different set of witnesses and evidence or legal standards substantially different from the claims asserted in the class action.  See, e.g., In re Celexa & Lexapro Mktg. & Sales Practices Litig., 65 F. Supp. 3d 283, 291 (D. Mass. 2014) (declining to apply class action tolling to newly asserted federal RICO claims where class action asserted Missouri consumer protection claims); Special Situations Fund III, L.P. v. Am. Dental Partners, Inc., 775 F. Supp. 2d 227, 246 (D. Mass. 2011) (declining to apply class action tolling where the newly asserted claim required "significantly different" factual pleadings and introduced a "sufficiently distinct" legal standard);  In re Neurontin Mktg. & Sales Practices Litig., No. 04-cv-10739-PBS, 2011 WL 3852254, at *48 (D. Mass. Aug. 31, 2011), aff'd, 712 F.3d 21 (1st Cir. 2013) (concluding that class action tolling did not apply to newly asserted claim arising under a statute that was not invoked in the class action complaint); Lindner Dividend Fund, Inc. v. Ernst & Young, 880 F. Supp. 49, 54-55 (D. Mass. 1995) (deciding that class action tolling did not apply where newly asserted claim required factual allegations that were "significantly different").  These cases are consistent with the rule that only sufficiently similar claims fall within the reach of class action tolling because with sufficiently similar claims the defendants have received due notice of the factual allegations against them.  Indeed, even while concluding that the claim before it was not tolled by the class action, the court in Lindner Dividend Fund, Inc. expressly recognized that "a subsequent individual suit need not necessarily be identical in every respect to an earlier class action for the limitations period to be tolled" and instead, the touchstone is whether "the class

action suit . . . g[a]ve defendant ample notice of plaintiff's individual claim." Lindner Dividend Fund, Inc., 880 F. Supp. at 54 (citation omitted).

Accordingly, Princeton's claims, including the negligence claim, were tolled for the period of time between the filing of the Town of Lexington class action, September 4, 2012, and the denial of class certification, March 24, 2015. Compare Town of Lexington, 12-cv-11645, D. 1 with Town of Lexington, 12-cv-11645, D. 241. As to the claims that Princeton has thus far asserted in this action, that period of time is hereby excluded from any timeliness calculations.

### D.      Defendants Are Entitled to Dismissal of the Mass. Gen. L. c. 93A Claim

The parties agree that wrongful conduct occurring after November 13, 1969, the effective date of Mass. Gen. L. c. 93A, is required to sustain a claim under Mass. Gen. L. c. 93A. D. 16 at 11; D. 25 at 9. Indeed, it is well settled that Mass. Gen. L. c. 93A cannot be applied to acts committed prior to its effective date. Lewis v. Ariens Co., 434 Mass. 643, 650 n.19 (2001) (citation omitted). "Chapter 93A affects substantive rights and, therefore, cannot be held retroactive." Springfield Library & Museum Ass'n, Inc. v. Knoedler Archivum, Inc., 341 F. Supp. 2d 32, 42 (D. Mass. 2004) (citations omitted). Princeton contends that Defendants violated Mass. Gen L. c. 93A by breaching Defendants' continuing duty to provide post-sale warnings regarding the risks of PCBs. D. 25 at 10. Without a continuing duty to warn, Princeton's Mass. Gen. L. c. 93A claim fails as a matter of law because Defendants' allegedly wrongful conduct otherwise occurred prior to November 13, 1989. D. 16 at 11-12.

Princeton's continuing duty claim fails because Princeton does not allege that Defendants had the ability to identify Princeton as a purchaser of PCB-containing products so that a warning could be issued. On a continuing duty to warn claim, a plaintiff must plead that: (1) the seller knew or reasonably should have known of product dangers discovered post-sale; (2) a reasonable

person in the seller's position would have provided a warning; (3) those to whom a warning might be provided were identifiable; and (4) the seller could effectively communicate a warning to those purchasers.  See Town of Lexington, F. Supp. 3d at 272-73 (citing Lewis, 434 Mass. at 647-48). Princeton's allegations do not address whether Princeton was identifiable to Defendants or whether Defendants could have effectively issued a warning to Princeton, two essential elements of the claim.  D. 1 ¶¶ 61-64.  Indeed, Princeton alleges specifically that Defendants manufactured the PCBs that were incorporated into the Prince School, rather than alleging that Defendants sold the PCBs directly to Princeton or otherwise directly interacted with Princeton.  Id. ¶ 49.  Thus, not only does Defendants' ability to identify Princeton remain unaddressed in the allegations, but also Princeton's allegations leave open the possibility that there was an intermediary from whom Princeton purchased the PCB-containing products.

In defense of its Mass. Gen. L. c. 93A claim, Princeton argues that it will "show that [Defendants] actually did give post-sale warnings to hundreds of customers in 1970 and that these warnings omitted known information about the dangers of PCB vapors and fumes." D. 25 at 10-11.  Princeton further argues that it will present evidence that "Monsanto misled regulators in the 1970s and pressured them to enact PCB regulations that were less protective of downstream users such as Princeton."  Id. at 11.  Those arguments do not address whether Defendants could have identified Princeton.  Even assuming that Defendants issued post-sale warnings to hundreds of customers, an allegation that does not appear in the complaint, Princeton has not alleged that it was among those customers, who those customers were or how those customers bear upon the question of whether Defendants could identify Princeton.  It is similarly unclear how Defendants' alleged misleading of regulators bears upon the question of whether Princeton was identifiable to Defendants.  Because Princeton has failed to allege that it was

identifiable to Defendants and, relatedly, that Defendants could effectively communicate a post-sale warning to Princeton, Princeton's Mass. Gen. L. c. 93A claim must be dismissed. Nonetheless, because the Court cannot conclude that amendment would be futile, the claim is dismissed without prejudice.

## VI.  Conclusion

For the foregoing reasons, the Court DENIES in part and ALLOWS in part Defendants' motion to dismiss.  D. 15.  The motion to dismiss is ALLOWED without prejudice as to the Mass. Gen. L c. 93A.  The motion to dismiss is DENIED as to the negligence and breach of warranty claims.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge